J-S30009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| COREY GIBBS | |
| Appellant | No. 367 EDA 2014 |

Appeal from the Judgment of Sentence September 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010054-2012;
CP-51-CR-0010056-2012

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED JUNE 05, 2015**

Appellant, Corey Gibbs, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for two (2) counts of first degree murder and one (1) count each of carrying a firearm without a license, carrying a firearm on public streets in Philadelphia, and possessing instruments of crime.[1] We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Appellant raises five issues for our review:

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 6106, 6108, 907, respectively.

> DID THE COMMONWEALTH'S FAILURE TO DISCLOSE **BRADY**[2] AND **GIGLIO**[3] MATERIALS DEPRIVE APPELLANT OF A FAIR TRIAL?
>
> DID PROSECUTORIAL COMMENTS LEAD THE JURY TO A VERDICT BASED ON EMOTION RATHER THAN ON REFLECTIVE JUDGMENT?
>
> WAS THE ADMISSION OF PHOTOGRAPHS OF THE DECEDENTS UNDULY PREJUDICIAL?
>
> WAS THE EVIDENCE ADDUCED AT TRIAL INSUFFICIENT TO SUPPORT CONVICTIONS FOR FIRST DEGREE MURDER?
>
> WAS THE JURY'S VERDICT AGAINST THE WEIGHT OF THE EVIDENCE?

(Appellant's Brief at ix).

In his first issue, Appellant asserts the Commonwealth deliberately withheld witness statements and prosecutor's notes in violation of **Brady** and **Giglio**. Specifically, Appellant contends the Commonwealth failed to produce pretrial statements from Mark Holmes, Valencia Thrones, Denise Jackson, and Derrick Andrews. Appellant argues each witness initially provided exculpatory information to police. Appellant insists, however, the police subjected the witnesses to "lengthy periods of illegal detention," which caused the witnesses to change their stories and incriminate Appellant. (Appellant's Brief at 13). Appellant insists the Commonwealth's actions

---

[2] **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[3] **United States v. Giglio**, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

resulted in prejudice, because trial counsel could not adequately prepare to cross-examine the witnesses or conduct an independent investigation of the circumstances preceding Appellant's arrest. Appellant concludes the Commonwealth deprived him of a fair trial, and this Court must vacate his judgment of sentence. Appellant's claim is waived.

A concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b), that is not specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal can result in waiver of the issue. **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super. 2006), *appeal denied*, 591 Pa. 712, 919 A.2d 956 (2007). "The court's review and legal analysis can be fatally impaired when the court has to guess at the issues raised." **Commonwealth v. Hansley**, 24 A.3d 410, 415 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011). "Thus, if a concise statement is too vague, the court may find waiver." **Id.** "Even if the trial court correctly guesses the issues [the appellant] raises on appeal and writes an opinion pursuant to that supposition, the issue is still waived." **Commonwealth v. Heggins**, 809 A.2d 908, 911 (Pa.Super. 2002), *appeal denied*, 573 Pa. 703, 827 A.2d 430 (2003).

Instantly, Appellant's Rule 1925(b) statement presented his first issue as follows: "The Commonwealth's Failure to Disclose **Brady** and **Giglio** Materials Deprived [Appellant] of a Fair Trial." (**See** Rule 1925(b) Statement, filed 7/28/14, at 1.) Significantly, Appellant failed to identify the

specific statements and prosecutor's notes now at issue.[4]  We conclude

Appellant's first issue is waived on this basis.  ***See Reeves, supra***;

***Heggins, supra***.

In his second, third, fourth, and fifth issues, Appellant challenges the

prosecutor's closing argument, the admissibility of certain photographs, and

the sufficiency and weight of the evidence.  After a thorough review of the

record, the briefs of the parties, the applicable law, and the well-reasoned

opinion of the Honorable Linda A. Carpenter, we conclude Appellant's

second, third, fourth, and fifth issues merit no relief.  The trial court opinion

comprehensively discusses and properly disposes of the questions

presented. (***See*** Trial Court Opinion, filed August 20, 2014, at 7-16)

(finding: **(2)** prosecutor's closing argument constituted fair response to

defense counsel's closing argument; prosecutor's remarks did not have

unavoidable effect of prejudicing jury; **(3)** during direct examination of

medical examiner, court permitted prosecutor to introduce photographs of

victims' injuries; photographs were relevant to show nature of wounds and

to aid medical examiner in testimony regarding cause of death; court

provided cautionary instruction, explaining purpose of photographs and

reiterating that verdict must be based on rational and fair consideration of all

_____

[4] The trial court, left to guess the exact nature of Appellant's claim, analyzed the pretrial statement from Mr. Holmes only.  (***See*** Trial Court Opinion at 4-6.)

evidence; **(4)** ample evidence supported verdict; Mr. Holmes saw Appellant come up Chadwick Street and open fire on victims; although Mr. Holmes disavowed many averments made in pretrial statement to police, prosecutor properly introduced Mr. Holmes' statement through testimony from detective; Mr. Holmes' statement amounted to prior inconsistent statement signed and adopted by declarant; Ms. Thrones and Ms. Jackson corroborated details from Mr. Holmes' statement regarding date, time, and location of shooting, and Appellant's acts of coming up street and firing handgun; testimony from Jillian Johnson established that Appellant went to her house after shooting, acted strange, and appeared to be under influence of something other than alcohol; Ms. Johnson also testified that Appellant was upset about being suspect and kept saying, "I don't think I did it"; medical examiner opined victims' deaths were caused by gunshot wounds to vital body parts; **(5)** jury was able to assess credibility of each witness; although witnesses disavowed portions of pretrial statements to police, jury had full opportunity to evaluate substance of pretrial statements and trial testimony; verdict did not shock one's sense of justice). Accordingly, we affirm.[5]

Judgment of sentence affirmed.

---

[5] Additionally, the Commonwealth has filed a petition "to accept brief inadvertently filed in excess of word limit." In its petition, the Commonwealth notes its appellate brief exceeds the word limit set forth in Pa.R.A.P. 2135. Despite this defect, the Commonwealth asks this Court to accept the brief. We grant the Commonwealth's petition and accept its brief as filed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/5/2015

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**TRIAL DIVISION – CRIMINAL SECTION**

FILED

AUG 2 0 2014

Criminal Appeals Unit
First Judicial District of PA

**COMMONWEALTH OF PENNSYLVANIA** :

v.                                                      :          **CP-51-CR-0010054-2012**
                                                                    **CP-51-CR-0010056-2012**
**COREY GIBBS**          CP-51-CR-0010054-2012 Comm. v. Gibbs, Corey
                                          Opinion



7188766391

**OPINION**

CARPENTER, J.                                                        August 20, 2014

Defendant Corey Gibbs ("Gibbs") was charged with and found guilty of 2 counts

of Murder of the First Degree (H1), Carrying Firearms Without a License ("VUFA §

6106") (F3), Carrying Firearms on Public Property in Philadelphia ("VUFA § 6108")

(M1), and Possession of Instrument of Crime ("PIC") (M1) on bills of information CP-51-

CR-0010054-2012 and CP-51-CR-0010056-2012. These charges arose from the

shooting deaths of Robert Alvin and Michael Butler on March 10, 2012 on the 1600

block of Susquehanna Avenue in the City of Philadelphia. This court requests that the

Superior Court uphold the convictions and affirm the sentence imposed in this matter.

**PROCEDURAL HISTORY**

On September 10, 2013, Gibbs elected to exercise his right to a jury trial and

pled not guilty to the above listed charges. On September 18, 2013, the jury found

Gibbs guilty of the above listed charges after which this court sentenced Gibbs to Life

imprisonment without parole on each of the homicide charges, to run consecutively. He

received no further penalty on the remaining charges. On September 23, 2013, Gibbs filed post-sentence motions, which were denied by operation of law on January 21, 2014.

On January 23, 2014, this court received a Notice of Appeal and on May 8, 2014, upon completion of the notes of testimony, Gibbs was served an Order directing him to file a concise statement of the matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On May 29, 2014, Gibbs filed a Motion to Extend Time to File a 1925(b) Statement, which this court granted, thereby extending the deadline to July 28, 2014. On July 28, 2014, this court received Gibbs' 1925(b) response which raised the following issues on appeal:

1. The Commonwealth's failure to disclose *Brady* and *Giglio* materials deprived defendant of a fair trial.

2. The admission of photographs of the decedents was unduly prejudicial to the defense.

3. Prosecutorial comments led the jury to a verdict based on emotion rather than on reflective judgment.

4. The evidence adduced at trial was not sufficient to support a conviction for first degree murder.

5. The jury's verdict is against the weight of the evidence.

## FACTS

On March 10, 2012, shortly before 11:00 p.m., Mark Holmes went into the Tex Lounge II bar, located on the corner of Chadwick Street and Susquehanna Avenue in the City of Philadelphia. Once inside, he saw defendant Gibbs, Michael Butler ("Butler"), and Robert Alvin ("Rebo") in the back playing pool and taking pictures. Shortly thereafter, Holmes walked back outside with Rebo and Butler and was standing

2

near the corner where two women – Valencia Thrones and Denise Jackson – were smoking. Both Mr. Holmes and Ms. Thrones saw Gibbs coming up Chadwick Street and moments later saw Gibbs shooting a gun in the direction of the corner of Chadwick Street and Susquehanna Avenue where everyone was standing. Gibbs fired approximately six shots in total. Ms. Thrones and Ms. Jackson dropped to the ground until the gunshots ceased. When they got back up, Ms. Thrones saw Gibbs riding up Chadwick Street on a bike. Derrick Andrews had since exited the bar and also saw Gibbs riding away while holding a gun in his hand. Latoyra Rainey, who lived on Chadwick Street near the Tex Lounge II bar, also heard the gunshots, which sounded like they were fired from the steps of her house. When she ran to her bedroom window, she saw one victim already on the ground, the second victim collapse on the ground, and the gunman riding a bike at the end of her block. Ms. Thrones and Ms. Jackson observed Butler lying face down on the corner and Rebo lying face down a short distance up the street. They went back inside the bar to tell the bouncer to call the police and then they left the area. Mr. Holmes left the area as well.

Later that evening, Gibbs went to the home of his friend, Jillian Johnson. Ms. Johnson had fallen asleep and was awoken when she heard Gibbs outside of her bedroom door. Gibbs was acting strange and appeared to be under the influence of something other than alcohol. Ms. Johnson went downstairs and saw two other men, who she did not know, standing in her living room. She asked them to leave and then she went back upstairs with Gibbs. One of the men returned to the front door and said "Tell him I need that stuff"[1] after which Gibbs went upstairs, came back down, met with the man, and then the man left. Ms. Johnson saw Gibbs again a few days later when

---

[1] N.T. 9/12/2013 at 96:4.

3

he told her that he was upset that his name was getting thrown into the shootings outside of the bar that had happened a few nights earlier and he kept saying "I don't think I did it."[2] Ms. Jackson also saw Gibbs a few days later when she was sitting outside with a group of people and he said that the streets were saying that he "killed them people and that the cops was looking for him"[3]

Rebo sustained three gunshot wounds to the arm, two of which subsequently penetrated his chest and Butler sustained a single gunshot wound to the face, which penetrated his brain. Each of their deaths was caused by the respective fatal gunshot wounds. Officer Fox recovered six (6) fired cartridge casings from a property on Chadwick Street, which were turned over to the firearms examiner. The fired cartridge casings were .40 caliber and were all fired from the same Glock firearm.

## DISCUSSION

### *Failure to disclose* Brady *and* Giglio *materials*

On appeal, Gibbs asserts that the Commonwealth's failure to disclose witness Mark Holmes' initial interaction with detectives in the Homicide Unit was in violation of *Brady v. Maryland*[4] and thus, deprived him of a fair trial. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[5] While this court agrees that the defense was entitled to such information, the Commonwealth's failure to disclose such information directly was cured by its disclosure at the preliminary hearing

---

[2] N.T. 9/12/2013 at 114:20-21.
[3] N.T. 9/11/2013 at 162:15-16.
[4] 373 U.S. 83 (1963).
[5] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

4

and this court's permitting the defense to cross-examine the witness at trial regarding this initial interaction with Homicide detectives.

During the direct examination of witness Mark Holmes, the prosecutor elicited testimony from Mr. Holmes and, in the course of the examination, introduced portions of his July 17, 2012 statement to police. On cross-examination, the defense elicited the following testimony with regard to Mr. Holmes' statement as well as his initial interaction with the Homicide detectives:

> **MR. BORUM**: [...] Do you see this statement? It's four pages and there's a signature on the bottom with a date and it's in question and answer form. You had a chance to look at this, right?
> **WITNESS**: Yes.
> **MR. BORUM**: And what the detectives basically did is they purported to ask a question and there's a Q for question.
> **WITNESS**: Right.
> **MR. BORUM**: And then they wrote down what they claim was your answer under A, right?
> **WITNESS**: Yes.
> **MR. BORUM**: And there's four pages of that question and answer and then your signature appears on this, right?
> **WITNESS**: Yes.
> **MR. BORUM**: Well, let me ask you. That first time when you were down there and you were locked in the room and you told them that Corey was in the bar and multiple detectives talked to you and you told them that, did they put that down on a statement like this with with questions and answers?
> **WITNESS**: No.
> **MR. BORUM**: Did they give you a chance to review it?
> **WITNESS**: No.
> **MR. BORUM**: Do you know why they wouldn't put that down on a statement?
> **WITNESS**: Because I was telling the truth.
> **MR. BORUM**: And do you know why the only reason I found out you were down there is because you testified at the preliminary hearing?
> **WITNESS**: Exactly.
> **MR. LIERMANN**: Objection to what counsel found out.
> **THE COURT**: Overruled.[6]

---

[6] N.T. 9/10/2013 at 275-276.

The defense also elicited the following testimony regarding Mr. Holmes' testimony at the preliminary hearing:

> **MR. BORUM**: So the first time you went down and you were locked in the room and you told them what you've told the jury you've said, it was not the same detective that took that written statement. That's correct, right?
> **WITNESS**: No. Yeah, that's correct.
> **MR. BORUM**: And I'm going on.
> > **Question**: "And how long did he speak with you?"
> > **Answer**: "He spoke to me like a good fifteen minutes."
> > **Question**: "Did he ask you questions about the shooting that happened at the Tax Bar on March tenth of this year?"
> > **Answer**: "Yes, sir."
> > **Next question**: "Did you answer those questions?"
> > **Answer**: "Yes, sir. I told them that. They kept on saying you know who shot them. And I said I don't know who shot Rebo. They was saying you was there. I was there but I didn't see nothing. It was like we got you on camera inside the bar shaking Corey's hand and they kept pinpointing it, saying it was Corey, it was Corey."
> **WITNESS**: Uh-huh.
> **MR. BORUM**: "I said it couldn't have been Corey because at the time of the shooting Corey was inside the bar." Do you remember testifying to that at the preliminary hearing?
> **WITNESS**: Yes. Yes.
> **MR. BORUM**: And is that what you told the detectives the first time you were locked in the room?
> **WITNESS**: Yes.
> **MR. BORUM**: And they didn't put it down on a statement, did they?
> **WITNESS**: No.
> **MR. BORUM**: They didn't have you sign that one, did they?
> **WITNESS**: They only put what's on the statement what I had lied about at the end. Because, you know, once I said I got inside my sister car, that was the truth. All the other stuff of me saying that I seen Corey running, shooting and doing all of that, all of that was a lie.[7]

Thus, the jury was able to evaluate the credibility of the witness' statement, his testimony at the preliminary hearing, as well as his testimony at trial in making its assessment of the evidence presented. As such, while the Commonwealth's failure to directly disclose the information concerning Mr. Holmes' initial contact with the Homicide Unit was improper, the disclosure at the preliminary hearing as well as the opportunity

---

[7] N.T. 9/10/2013 at 281-283.

6

to cross-examine the witness about such contact at trial prevented defendant Gibbs from suffering the prejudice that would result in the denial a fair trial.

### Admission of photographs

The admission and exclusion of evidence is a matter within the discretion of the trial judge and shall only be overturned upon a finding of abuse of discretion.[8] As a preliminary matter, the trial court must determine that the evidence sought to be introduced is relevant, meaning that it "tends to make a fact in issue more or less probable."[9] All relevant evidence is admissible, unless otherwise provided by law; however, the court may exclude such evidence if there is a danger that unfair prejudice will outweigh its probative value.[10] "Unfair prejudice" indicates a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."[11] The Supreme Court of Pennsylvania emphasized this balancing test when it established that a trial court should exclude otherwise relevant evidence if, in the court's judgment, "its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial."[12]

In the instant matter, Gibbs avers that the admission of photographs of the decedents was unduly prejudicial to the defense. This court disagrees. During the direct examination of the medical examiner, Dr. Collins, this court permitted the prosecutor to introduce Exhibits 21 and 22 which included Dr. Collins' photographs that

---

[8] *Com. v. Vandivner*, 962 A.2d 1170, 79 (Pa. 2009).

[9] Pa.R.E 401; *Com. v. Mitchell*, 902 A.2d 430, 465 (Pa. 2006).

[10] Pa.R.E. 402; Pa.R.E. 403; *Com. v. Mitchell*, 902 A.2d 430, 465 (Pa. 2006).

[11] Pa.R.E. 403 cmt.

[12] *Com. v. Ulatoski*, 371 A.2d 186, 192 (Pa. 1977) (citing J. McCormick, Evidence § 190, at 453-54 (2d ed. 1972).

7

portrayed the injuries sustained by the victims, Michael Butler and Robert Alvin, respectively. The photographs were relevant to show the nature of the wounds and to aid Dr. Collins in his testimony as to his examination of the bodies and his conclusions regarding the cause and manner of death of each of the decedents. Prior to the jury seeing the photographs, however, this court provided the following instruction:

> **THE COURT**: I just want to, before I have the District Attorney put some photographs up on the screen for Dr. Collins to tell you about, I want to let you know that the photographs that are going to be admitted into evidence are admitted for the purpose of showing to you the nature of the wounds that were received by the deceaseds in this case, Mr. Alvin and Mr. Butler. Now, I want to let you know that they may not be pleasant photographs to look at. You should not let this stir up in you any emotions to the prejudice of the defendant. Remember, your verdict must be based on a rational and fair consideration of all the evidence and not on any passion or prejudice against the defendant, the Commonwealth or anyone else connected to the case. The photographs, again, are only being shown for the purpose of showing you the nature of the wounds received.[13]

The instruction clarified for the jury the purpose of seeing the photographs, such that the jury could use the photographs in assessing the information provided through the testimony of Dr. Collins. Moreover, the instruction specifically prohibited the jury from evaluating the photographs in an emotional manner, thereby ensuring that their introduction was not unduly prejudicial. In consideration of the relevant purpose of the photographs and this court's clarifying instruction to the jury, this court has determined that Gibbs' claim of prejudice lacks merit.

### Prosecutorial misconduct

Prosecutorial misconduct occurs when a prosecutor intentionally undertakes actions in order to prejudice the defendant to the point where he has been denied a fair

---

[13] N.T. 9/12/2013 at 53-54.

8

trial.[14] In drawing a distinction between mere error and misconduct, our Superior Court opined that "[a] fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied."[15] In assessing a claim of prosecutorial misconduct, the court must determine whether the unavoidable effect of the prosecutor's conduct was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict.[16] With regard to closing remarks by a prosecutor, the Pennsylvania Superior Court opined in *Commonwealth v. Judy*[17] that:

> [i]t is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict."[18]

The Court further stated that "comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing."[19]

On appeal, Gibbs asserts that prosecutorial comments led the jury to a verdict based on emotion rather than on reflective judgment. Although this court finds that Gibbs' misconduct claim lacks the requisite specificity and is thus waived, this court has

---

[14] *Com. v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. 2001).
[15] *Id.*
[16] *Id.*
[17] 978 A.2d 1015 (Pa. Super. 2009).
[18] *Id.* at 1020 (citing *Com. v. Holley*, 945 A.2d 241, 250 (Pa. Super. 2008)).
[19] *Com. v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (citing *Com. v. Chmiel*, 889 A.2d 501, 544 (Pa. 2005)).

9

chosen to address the issue, based upon a series of objections made in the course of the prosecutor's closing remarks to the jury. For ease on review, this court has included the excerpt from the transcript illustrating the objections made during the prosecutor's closing remarks and this court's response to such objections:

**MR. LIERMANN**: Ladies and gentlemen, this is 2013. This is the era of the ACLU, the federal government, the Department of Justice, the Internal Affairs Division, federal lawsuits, the Innocence Project. Anyone and everyone looks into every single case like this. So the days that counsel wants you to believe, the movies he wants you to talk about, simply are not the case. But what does happen? Now, I don't know where defense attorney lives and maybe in Bryn Mawr they don't have to do this, but in Bryn Mawr there aren't double murders over PCP and drugs. So I don't know where he's from, but in Philly, in a city where four hundred people, four hundred people, men, women and children, were murdered last year -
**MR. BORUM**: Objection.
**MR. LIERMANN**: -- four hundred people, we want those people --
**MR. BORUM**: Objection.
**THE COURT**: Mr. Liermann, just be mindful of the objection.
**MR. LIERMANN**: Thank you, Your Honor. You cannot expect homicide detectives in our city, in our city, to simply act like Dunkin Donuts workers. They're not going to simply sit there at their desk twiddling their thumbs waiting and hoping that someone comes in and says, yeah, that's the guy that ambushed two unarmed men outside in front of a bar full of people last night. They're not going to sit there and write down what you say and send you on your merry way and hope that someone comes forward. That's not real life and for better or for worse, that's not the circumstances and the way our city works. What they do is they go out. They investigate and they find out who was out there. It's a bar full of people. There's a crowd of people out front. Who was out there? They go out. They find out who they are and they bring them in, and you sit. You need to think while you're sitting. And what you know is that they can't make you say anything, but when you do say something you know that it's going to be investigated. It's going to be checked. It's going to be vetted. And it's amazing how simple yet effective that is. Because at the end of the day, folks, most people, most people have a conscience. And if you see two men gunned down for no reason, you don't want that guy getting away with it. And ultimately, it's easier down there. It's easier when you're in the safety of the police district. You don't have fourteen people watching your every move. You don't have to stare down a cold-blooded murderer who now is not armed with a gun, he's armed with a high-powered attorney.
**MR. BORUM**: Objection.
**MR. LIERMANN**: You don't have to testify in open court, in front of a room full of his own people, worrying about going to that neighborhood and what the consequences are when they find out in open court that you are a

10

snitch. And, ladies and gentlemen, of course, you also haven't yet walked back out to your neighborhood and had someone present you with a copy of your statement. Let's talk about that. Where does that come from? Those aren't public records. They came from one of two places, this side of the table or that side of the table.

**MR. BORUM**: Objection. The notes of testimony can be ordered by anyone. Objection.

**THE COURT**: Mr. Borum, I'll instruct the jury at the end about your objections. I'd just remind you about proper decorum during closings. Mr. Liermann, you may continue.

**MR. LIERMANN**: Thank you, Your Honor. So the detectives do their work. They bring people in to get to the bottom of it, to get to the truth. So let's talk about what those witnesses said. Let's start with Mark Holmes.[20]

Upon review of the evidence presented at trial and the closing arguments of defense counsel, this court has determined that the prosecutor's remarks did not constitute misconduct. The remarks were made in fair response to the defense's portrayal of the Commonwealth as the wizard in the Wizard of Oz, the defense's intimations of police misconduct, and the defense's explanation for the witness recantation at trial. As such, the prosecutor's remarks were proper argument and did not have the unavoidable effect of prejudicing the jury.

### Sufficiency of the evidence

The standard applied when reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.[21] In applying this test, the Superior Court may not weigh the evidence and substitute its judgment for that of the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of

---

[20] N.T. 9/16/2013 at 45-48.
[21] *Com. v. Heberling*, 678 A.2d 794, 795 (Pa. Super. 1996) (citing *Com. v. Williams*, 650 A.2d 420 (Pa. 1994)).

11

innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless, the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the combined circumstance.[22] The Commonwealth may satisfy its burden of proving an element of the crime beyond a reasonable doubt through the use of wholly circumstantial evidence. In applying the test, the whole record must be evaluated and all evidence received must be considered.[23] Additionally, any challenge to the sufficiency of the evidence must specify the element or elements upon which the evidence was insufficient; otherwise the claim is waived.[24]

On appeal, Gibbs asserts that the evidence was insufficient to support his convictions for first degree murder. This court disagrees, having found the evidence to be more than sufficient to support the jury's verdict. At trial, the jury heard testimony from Mark Holmes, Valencia Thrones, Denis Jackson, Derrick Andrews, Latoyra Rainey, Jillian Thompson, numerous police officers and detectives, as well as the medical examiner, Dr. Collins. The testimony of eye-witness Mark Holmes established that, on the evening of March 10, 2012, he went into the Tex Lounge II bar, located on the corner of Chadwick Street and Susquehanna Avenue, where he saw Gibbs, Butler, and Rebo in the back playing pool and taking pictures. Shortly thereafter, Holmes walked back outside with Rebo and Butler and was standing near the corner where Valencia Thrones and Denise Jackson were smoking. Mr. Holmes saw Gibbs coming up Chadwick Street and moments later saw him shooting a gun toward of the corner of Chadwick Street and Susquehanna Avenue where everyone was standing. Mr. Holmes identified Gibbs, Rebo, and Butler in his July 17, 2012 statement to police. Although

---

[22] Com. v. Cassidy, 668 A.2d 1143, 1144 (Pa. Super. 1995).
[23] Com. v. Valette, 613 A.2d 548, 549 (Pa. 1992).
[24] Com. v. Williams, 959 A.2d 1252, 1257 (Pa. Super. 2008).

12

Mark Holmes disavowed many of the averments made in his statement to police, his signed statement was properly admitted as evidence at trial through the testimony of Detective Byard. The statement was admissible for its truth as a prior inconsistent statement that was signed and adopted by the declarant.[25]

The testimony of eye-witnesses Valencia Thrones and Denise Jackson corroborated that of Mark Holmes with regard to the date, time, and location of the shooting as well as the actions by Gibbs in coming up Chadwick Street and firing approximately six shots toward the corner where they were standing. Their testimony also confirmed that both Rebo and Butler had been shot and were lying face down on the street. Ms. Thrones' testimony further established that Gibbs fled the scene riding up Chadwick Street on a bike. Ms. Jackson's testimony further established that, a few days after the shootings, Gibbs knew that the streets were saying that he "killed them people and that the cops was looking for him"[26] Additionally, the collective testimony of Derrick Andrews and Latoyra Rainey further corroborated that the shots were fired from Chadwick Street, that two victims were shot, and that Gibbs fled up Chadwick Street on a bike with a gun in his hand. Ms. Thrones, Ms. Jackson, and Mr. Andrews each identified Gibbs and Rebo in their respective statements to police. Although Valencia Thrones and Derrick Andrews disavowed many of the averments made in their statements to police, their signed statements were properly admitted as evidence at trial through the respective testimony of Detective Burns and Detective Lucke. Each statement was admissible for its truth as a prior inconsistent statement that was signed and adopted by the declarant.[27]

---

[25] See Pa.R.E. 803.1(1)(b).

[26] N.T. 9/11/2013 at 162:15-16.

[27] See Pa.R.E. 803.1(1)(b).

13

The testimony of Jillian Johnson established that, following the shootings, Gibbs came to her house, was acting strange, and appeared to be under the influence of something other than alcohol. Her testimony also confirmed that a few days after the shootings Gibbs was upset that his name was getting thrown into such shootings and that he kept saying "I don't think I did it."[28]

Finally, the testimony of Officer Wolfe, Officer Fox, and the firearms examiner Anne Marie Barnes, confirmed that six fired cartridge casings were recovered in front of a property on Chadwick Street and that all six casings were .40 caliber and fired from the same Glock firearm. Additionally, Dr. Collins' testimony established that Rebo sustained three gunshot wounds to the arm, two of which subsequently penetrated his chest and Butler sustained a single gunshot wound to the face, which penetrated his brain. Each of their deaths was caused by the respective fatal gunshot wounds.

In consideration of the multiple eye-witness accounts, by individuals who knew Gibbs, establishing that Gibbs traveled up Chadwick Street and began shooting at a corner where numerous people were standing and then fled the scene on a bike in conjunction with the wounds inflicted on the two victims, this court has found that the evidence supported the jury's finding that Gibbs killed Rebo and Butler with the specific intent to kill and with malice. As such, this court, in viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, has determined that the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that Gibbs was guilty of Murder of the First Degree.

---

[28] N.T. 9/12/2013 at 114:20-21.

14

## *Weight of the evidence*

The standard of review for a challenge to the weight of evidence is well settled in Pennsylvania. The fact finder is the exclusive judge of the weight of evidence, is free to believe all, part, or none of the evidence presented, and determines the credibility of the witnesses.[29] An appellate court cannot substitute its judgment for that of the fact finder.[30] A verdict will be reversed and a new trial granted only where the verdict is so contrary to the evidence as to "shock one's sense of justice."[31] A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have come to another conclusion.[32] Pennsylvania appellate courts have repeatedly emphasized that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence."[33] Additionally, a challenge to the weight of the evidence that is too vague to allow the court to identify the issue raised on appeal is deemed to be waived.[34]

On appeal, Gibbs asserts that the verdict was against the weight of the evidence. This court similarly disagrees with this claim, having found the weight of the evidence to support the jury's verdict. As discussed at length above, the jury heard testimony from numerous eye-witnesses and was able to assess each of their credibility as a witness. Although Mark Holmes, Valencia Thrones, and Derrick Andrews disavowed portions of their respective statements to police, the jury had the full opportunity to evaluate the substance of the statements as well as their testimony at trial in making the relevant

---

[29] *Com. v. Champney*, 832 A.2d 403, 408 (Pa. 2004).
[30] *Id.*
[31] *Com. v. Passmore*, 857 A.2d 697, 708 (Pa. Super. 2004).
[32] *Thompson v. City of Philadelphia*, 493 A.2d 669, 673 (Pa. 1985).
[33] *See Com. v. Forbes*, 867 A.2d 1268, 1273 (Pa. Super. 2005); *See also Com. v. Brown*, 648 A.2d 1177 (Pa. 1994).
[34] *Com. v. Seibert*, 799 A.2d 54, 62 (Pa. Super. 2002).

15

factual determinations. Similarly, the jury heard testimony from Latoyra Rainey. Dr. Collins, and the firearms examiner, all of which corroborated the eye-witnesses' collective account of the shootings, and the jury was able to assess their credibility. The jury verdict, reflecting the assessment of all of the evidence presented at trial, was not so contrary to the evidence presented at trial as to "shock one's sense of justice." Therefore, this court finds no merit in Gibbs' challenge to the weight of the evidence presented at trial.

## CONCLUSION

For the reasons set forth in this Opinion, the Superior Court should affirm this court's admission of evidence, the jury's finding of guilt, and the sentence imposed in this matter.

_____
Carpenter, J.

16

**First Judicial District of Pennsylvania**
**Honorable Linda A. Carpenter**
**1418 Criminal Justice Center**
**1301 Filbert Street**
**Philadelphia, PA 19107**


Commonwealth  v. Corey Gibbs
CP-51-CR-001054-2012
CP-51-CR-001056-2012

Date: August 20, 2014


## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:


Defense Counsel/Party:    Trevan Borum, Esquire
                          Borum, Burke, DiDonato & Vocci LLC
                          1500 JFK Boulevard, Suite 900
                          Philadelphia, PA 19102

Type of Service:  ( ) Personal    ( X ) First Class Mail    ( ) Other, please specify: _____


District Attorney:    Hugh J. Burns, Jr., Esq.
                      Philadelphia District Attorney's Office
                      Three South Penn Square
                      Philadelphia, PA  19107 – 3499

Type of Service:  ( ) Personal    ( X ) First Class Mail    ( ) Other, please specify: _____


_____
Janet Brinkman